[Cite as *In re J.H.*, 2016-Ohio-3242.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.H.

C.A. No. 28008

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 13-8-529

DECISION AND JOURNAL ENTRY

Dated: June 1, 2016

MOORE, Judge.

{¶1}    Appellant, Stacy H. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to one of her minor children and placed the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}    Mother is the biological mother of five minor children, all of whom have been removed from her custody. The only child at issue in this appeal is Mother's oldest child, J.H., born May 1, 2004. The father of J.H. did not participate in the trial court proceedings and is not a party to this appeal.

{¶3}    CSB has a history of involvement with Mother and J.H. dating back to January 2008, when Mother had only two children, J.H., then three years old, and a daughter who is one year younger than J.H. Both children were removed from Mother's custody because they were

found alone outside without weather-appropriate clothing and the condition of their home was deplorable. Mother, who was at home asleep while the young children wandered outside of her home, was charged with child endangering, later convicted of a lesser charge, and ordered to cooperate with CSB's case plan.

{¶4} Through its investigation of neglect referrals prior to 2008, CSB was aware that Mother has cognitive delays. Consequently, the case plan in the 2008 case focused on Mother improving her understanding and ability to meet her children's basic needs through parenting education, counseling, and other services.

{¶5} Mother worked on the goals of the case plan and, during October 2008, J.H. and his younger sibling were returned to her custody under an order of protective supervision. During the period of protective supervision, Mother received ongoing supportive services through CSB and community providers, but CSB remained concerned about her ability to consistently provide her children with a safe and stable home.

{¶6} On July 9, 2009, Mother gave birth to her third child. While still under the protective supervision of CSB one month later, Mother's three children were removed from her home pursuant to Juv.R. 6 because the home was again in a deplorable condition and Mother was not adequately supervising the children or providing for their basic needs. All three children were later placed in the temporary custody of CSB. The two siblings of J.H. were ultimately placed in the legal custody of paternal relatives.

{¶7} After he was removed from Mother's custody during 2009, then five-year-old J.H. began sexually acting out in his foster home. He later disclosed that he had been raped by Mother's boyfriend, the father of his then-youngest sibling. CSB further discovered that Mother's then boyfriend had a long history of domestic violence, substance abuse, and mental

health problems. Mother denied having any knowledge about the incident because she had been in the hospital when the sexual abuse allegedly occurred.

{¶8} J.H. was later placed with his paternal grandparents, who were granted full legal custody of him on April 27, 2010. While J.H. lived in the custody of his grandparents for nearly three years, the parties filed motions with the court to resolve disputes about Mother's visitation rights. During December 2012, based on a mediated agreement between Mother and the parental grandparents, J.H. was returned to Mother's legal custody.

{¶9} At the time J.H. returned to Mother's custody in 2012, she was involved in a live-in relationship with another man and had given birth to her fourth child with him and was pregnant with her fifth child. Mother later gave birth to her fifth child and, shortly afterward, an incident of domestic violence between Mother's then-boyfriend and one of the children led to the third removal of J.H. from Mother's custody. After the boyfriend physically assaulted one of the youngest children, neither parent sought medical help for the child. Mother explained that she did not know that the father had injured the child because she was sleeping at the time and, although she later observed redness and swelling on the child's face, she assumed that she had been crying. When a woman who babysat the child observed significant swelling and bruising on the child's face, she immediately took her to the hospital.

{¶10} On August 22, 2013, CSB filed the complaint to begin this case, alleging that J.H. was a dependent child because his younger half-sibling had been physically abused by that child's father, who lived in the home. Although the youngest siblings were involved in the trial court case, the facts pertaining to them will not be set forth in detail because they are not parties to this appeal.

{¶11} Prior to the adjudication of J.H. in this case, the trial court appointed a guardian ad litem to represent the best interests of Mother. Shortly afterward, Mother's guardian ad litem filed a report to explain that, because Mother had developmental disabilities, she struggled "with understanding general concepts involving her child[]" and, for that reason, would require case plan assistance to improve her ability to parent her child. The same guardian ad litem continued to represent Mother's best interests throughout these proceedings.

{¶12} The current case plan again focused on Mother engaging in counseling and parenting education with a goal of her gaining insight into how to consistently meet the needs of J.H. In addition to the basic needs of J.H., the case plan also focused on his special needs because he had mild developmental disabilities and had also been diagnosed with attention deficit hyperactivity disorder and post-traumatic stress disorder.

{¶13} Mother obtained a parenting assessment during this case, which revealed that she has mild developmental disabilities and functions at the level of a 10-year-old child on verbal skills but only at the level of a 7 or 8 year old on nonverbal skills. Although Mother stated that she had been managing her own finances, the psychologist who evaluated her reported that her math skills were so deficient that she lacked the ability to budget money or count change. Mother had completed parenting classes in her prior cases, but she did not demonstrate the ability to implement what she should have learned. The psychologist emphasized that Mother lacked insight into how to provide age-appropriate structure, boundaries, discipline, or safety for a child.

{¶14} Mother also has a dependent personality, suffers from depression, and tends to become involved with abusive men, two of whom had caused harm to her children. The psychologist was particularly concerned that Mother tended to minimize the significance of her

children's injuries and the potential disturbance and risk that those men posed to her family. Although the psychologist opined that Mother's prognosis was poor, she recommended that Mother again engage in counseling and intensive parenting classes to explore the past abuse of her two children and develop an understanding of how to protect J.H. from harm in the future.

{¶15} The case plan also required Mother to develop an understanding of the current mental health needs of J.H. so she could provide him with appropriate emotional support. During this case, J.H. was involved in some of Mother's intensive parenting classes and he also engaged in individual counseling to address the serious trauma that he had sustained as a young child when he was raped by Mother's boyfriend. He received ongoing counseling throughout this case to address his fears and anxiety and to improve his self-confidence and self-control. J.H. was open and cooperative with his counselor, who reported that J.H. was making progress through counseling.

{¶16} Mother, on the other hand, made little progress in intensive parenting classes or counseling. She engaged in some counseling during the first year of this case, but did not attend her scheduled sessions regularly and eventually stopped going altogether. Her former counselor testified that Mother did not want to talk about the past abuse of her children. She opined that Mother did not understand that she needed to learn from those incidents to protect J.H. from future risks of abuse.

{¶17} After five sessions of intensive parenting classes, the instructor concluded that Mother was not gaining any insight into how to protect J.H., so the sessions were discontinued. In the classes, Mother was similarly reluctant to talk about the past abuse of her children and continued to dismiss each event as an isolated incident that was not a "big deal." During the next several months, Mother was offered two opportunities to reengage in parenting classes and,

although she scheduled sessions, Mother failed to attend the sessions or offer any reason for her absences.

**{¶18}** After nearly one year of working on her third reunification case plan, Mother's guardian ad litem reported to the court that Mother lacked the ability to safely parent J.H. She recognized that Mother loved J.H. and that she had been genuinely trying to meet his basic needs, but she opined that, despite working on numerous case plans to acquire appropriate parenting skills, Mother continued to lack the necessary insight into how to protect him from future abuse.

**{¶19}** CSB eventually moved for permanent custody of J.H. Following a hearing on the motion, the trial court terminated Mother's parental rights and placed J.H. in the permanent custody of CSB. Mother appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

> THE TRIAL COURT ERRED BY FINDING BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY SHOULD BE GRANTED TO [CSB] AND BY DENYING MOTHER'S MOTION FOR LEGAL CUSTODY OF [J.H.]

**{¶20}** Mother's sole assignment of error is that the permanent custody judgment is not supported by the evidence before the trial court. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of

the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶21} The trial court found that the first prong of the test was satisfied because J.H. had been in the temporary custody of CSB for more than 12 of the prior 22 months. Mother does not challenge that finding but instead confines her assigned error to the best interest prong of the permanent custody test. She asserts that the trial court should have instead granted a six-month extension of temporary custody. The trial court must conduct a best interest analysis to determine whether to place the child in the permanent custody of the agency or to extend temporary custody. If permanent custody was in the best interest of J.H., the alternative disposition of extending temporary custody was not. *See In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. Moreover, the trial court would have authority to extend temporary custody only if it also found that Mother had made "significant progress" on the case plan and that there was reasonable cause to believe that J.H. would be reunified with her or otherwise permanently placed during the extension period. R.C. 2151.415(D)(1). As detailed above, Mother had not made significant progress on the reunification goals of the case plan.

{¶22} We agree with the trial court that CSB demonstrated by clear and convincing evidence that permanent custody was in the best interest of J.H. When determining the child's best interests under R.C. 2151.414(D), the juvenile court must consider all "relevant" factors, including the interaction and interrelationships of the child, his wishes, the custodial history of the child, and his need for permanence in his life. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Although the trial court is also required to consider any relevant factors under R.C. 2151.414(E)(7) through (11), none of those factors applied to the facts of this case. *See id.*

{¶23} Mother's interaction with J.H. during this case was limited to supervised visitation. Mother consistently attended scheduled visits and no one disputed that she and J.H. loved each other, were closely bonded, and that they interacted well during visits. The primary concern of CSB was Mother's ability to meets the needs of J.H. outside a supervised setting. Despite repeated parenting courses throughout the life of J.H., Mother still did not understand how to provide appropriate care for him, given his age and special needs. J.H. had been diagnosed with PTSD, ADHD, and cognitive delays, but Mother did not understand any of those conditions and seemed to confuse them, as she believed that his cognitive delays were caused by a past emotional trauma.

{¶24} The impact of her cognitive impairments on her parenting ability was further demonstrated through her testimony at the hearing. For example, Mother could not remember how many times J.H. had been removed from her custody, the age at which he was raped by her former boyfriend, or whether J.H. was older or younger than one of his younger siblings. Mother also testified that, if J.H. were returned to her custody and she obtained employment, she would send 11-year-old J.H. to a certified daycare center. During cross-examination about whether Mother actually meant an after-school program because J.H. attended school and was too old for daycare, Mother's answers do not demonstrate any understanding of the distinction between the two types of childcare programs.

{¶25} Moreover, Mother had a history of becoming involved with abusive men and exposing her children to violence. J.H. had been raped by Mother's former boyfriend and his younger sibling was physically abused by another boyfriend. More significantly, Mother took no responsibility for failing to protect her children on either of those occasions. She continued to emphasize that she was not the abuser and that she was either sleeping or away from the home at

the time of each incident. She appeared not to understand the impact of her relationship choices upon the safety of her children. Despite numerous attempts by CSB to engage Mother in counseling and parenting education, Mother had been unwilling to discuss the past abuse of her children and, therefore, failed to learn how to protect J.H. from future abuse.

{¶26} J.H. had expressed that he wanted to return to Mother's home or live with his paternal grandmother. Although the grandmother initially expressed an interest in providing a permanent home for J.H., she later changed her mind. J.H. understood that the foster parents had no interest in adopting him and believed that no one wanted him except Mother.

{¶27} The guardian ad litem recognized that J.H. and Mother loved each other and were bonded, but opined that permanent custody was in the best interest of J.H. As several witnesses had also explained, Mother lacked the ability to meet the basic and special needs of J.H. or the insight to protect him from future harm.

{¶28} By the time of the hearing, J.H. was 11 years old and had spent almost half of his life living outside Mother's custody, because he had been removed from her custody on three separate occasions and, at one point, lived in the custody of his paternal grandparents for several years. During the periods of time that J.H. did reside with Mother, he was raped by one of her boyfriends and his younger sibling was physically harmed by another.

{¶29} Given that J.H. had spent most of his life moving in and out of temporary placements, he was in need of a legally secure permanent placement. Mother was not able to provide him with a suitable home, and CSB had been unable to find a relative who was willing and able to do so. Consequently, the trial court reasonably concluded that a legally secure permanent placement would only be achieved by placing J.H. in the permanent custody of CSB.

**{¶30}** Mother has failed to demonstrate that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Consequently, her assignment of error is overruled.

### III.

**{¶31}** Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attonrey, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.